NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0439n.06

Case No. 19-3740

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

NORTH CANTON BOARD OF
EDUCATION,

   Plaintiff-Appellant,

v.

AMERICAN TELEPHONE & TELEGRAPH,
INC.,

   Defendant-Appellee,

NEW CINGULAR WIRELESS PCS, LLC,

   Defendant-Appellee,

NCWPCS MPL 30-YEAR TOWER
HOLDINGS, LLC

   Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

FILED
Jul 29, 2020
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF
OHIO

**OPINION**

BEFORE: DONALD, THAPAR, and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. Parties are generally free to contract however they wish. So this agreement's limited revenue sharing provision means what it says—the parties had to share certain revenues, but not all of them. AT&T, through its subsidiary, leased property from a school overseen by the North Canton Board of Education to build a cell tower. That lease gave AT&T the right to market and sublease the tower's collocation space but required it to share sublease revenue with the Board. Yet AT&T decided it wanted out of the cell tower management business. So it

transferred its management obligations, and its right to receive a portion of the sublease revenue, to Crown Castle. Crown Castle paid AT&T for this transfer, but AT&T shared none of the transfer fee with the Board. So the Board sued for breach of contract. Because we agree with the district court that this transfer did not trigger the revenue sharing provision, there was no breach. We **AFFIRM.**

I.

In 2005, the North Canton Board of Education (the "Board") leased property behind North Canton High School's football field scoreboard (the "Premises") to New Cingular Wireless PCS, LLC ("Cingular"), an indirect subsidiary of AT&T, Inc. ("AT&T"). The lease permitted Cingular to "use the Premises for (i) the installation, operation, maintenance, repair, replacement[,] and relocation of all of the Equipment comprising [a] Cell Site and (ii) for the transmission and reception of communication signals pursuant to all rules and regulations of the [FCC]." (R. 95-1, Lease Agreement § 3 at PageID # 4412.) But it also required Cingular to "maintain the Cell Site in proper operating condition and within industry-accepted safety standards." (*Id*. § 7(c) at PageID # 4414.)

City regulations require operators of newly constructed cell towers to permit "collocation" until the tower reaches capacity.[1] So the parties included a revenue sharing provision in the lease for collocation on the cell tower that Cingular would construct.  In addition, that provision, section 10(b), originally permitted Cingular to "sublease space on the Premises . . . or allow another party's use of the Premises," if Cingular shared its revenue from these activities with the Board and

---

[1] Those same regulations define "collocation" as: "The use of a wireless telecommunications facility by more than one wireless telecommunications provider." (R. 93-4, N. Canton Zoning Ordinance § 1157.02(a) at PageID # 3170.)

obtained the Board's reasonable approval for any sublease. (R. 95-1, Lease Agreement § 10(b) at PageID # 4415.) It also made clear that permitting a third party to collocate constituted a sublease.

The original lease only contemplated no more than two subleases or grants of permission to use the Premises. So after Cingular built another cell tower on the Premises, the parties amended the lease in 2013 to, among other things, extend section 10(b)'s revenue sharing provision to cover revenue Cingular generated from "any subsequent sublessee . . . or other party using the Premises[.]" (R. 95-2, First Amendment to Lease Agreement § 7 at PageID # 4432.)

Soon after, AT&T decided to exit the cell tower management and subleasing business. So it entered a "Master Agreement" with Crown Castle International Corp. ("Crown Castle"), where Crown Castle assumed AT&T and its subsidiaries' management and landlord responsibilities, and received the right to AT&T's share of the collocation revenue, for over 9,100 cell towers. The Master Agreement required Cingular to assign "all of [its] respective right[s], title[,] and interest in" the Premises (from its lease with the Board) to a newly created AT&T subsidiary, NCWPCS MPL 30-Year Sites Tower Holdings, LLC ("Tower Holdings"). (R. 103, Master Agreement § 2.2(a) at PageID # 7322.) But Cingular kept its FCC licenses, its wireless communications equipment on the cell towers at the Premises, and its right to use its existing cell tower space. Tower Holdings then, as required by the Master Agreement, entered a separate "Management Agreement" with CCATT, LLC, a subsidiary of Crown Castle.

Tower Holdings retained "its right, title[,] and interest in" the Premises but appointed CCATT to "manage and operate" the Premises. (R. 93-16, Management Agreement Recital B(3) at PageID # 3731.) But it "delegate[d] all of its respective rights, duties, obligations[,] and responsibilities under the [existing] Collocation Agreements" and authority to execute new collocation agreements to CCATT. (*Id.* § 2(a), (c) at PageID # 3733–34.) And CCATT assumed

responsibility for paying the expenses associated with the Premises but became entitled to all revenue related to the Premises. In other words, CCATT received monthly rent payments from preexisting collocation agreements (with Verizon and T-Mobile) and would keep AT&T's revenue share from any additional collocation agreements CCATT negotiated as well. But CCATT had to pay the Board its share of the revenue, under section 10(b) of the lease, and pay Tower Holdings' rent obligation each month. CCAT also understood its general obligations as manager and operator to include general upkeep of the Premises, such as a yearly inspection, fence maintenance, weed control, and garbage removal. As consideration for everything in the Master Agreement, Crown Castle paid AT&T a cash lump sum.

After the parties executed the Management Agreement, CCATT sent the Board a letter, notifying it that CCATT was "managing the property on AT&T's behalf," and a copy of the Management Agreement. (R. 104-1, Ex. U1 at PageID # 7467.) A dispute soon arose about whether the Management Agreement triggered the lease's revenue-sharing provision (section 10(b)) and whether Tower Holdings was delinquent in its rent payments. The parties tried to resolve the dispute by executing a second amendment to the lease agreement. Under this amendment, Tower Holdings agreed to make a payment reconciliation for the delinquent rent payments and associated attorneys' fees. The amendment also acknowledged that section 10 of the lease permitted Cingular's assignment of the lease to Tower Holdings and that "CCATT manages and operates the site related to the Lease for [Tower Holdings] and is obligated to comply with the terms of the Lease." (R. 95-3 Second Amendment to Lease Agreement at PageID # 4452.)

Unsatisfied, the Board sued AT&T, Cingular, and Tower Holdings in Ohio state court, alleging that Cingular and Tower Holdings breached section 10(b) of the lease by failing to share

revenues earned under the Management Agreement and that AT&T tortiously interfered.[2] Defendants removed the case invoking diversity jurisdiction. AT&T then moved to dismiss the tortious interference claim and the district court granted the motion and dismissed AT&T as a party. After discovery, all remaining parties moved for summary judgment. The district court granted Defendants' motion, denied the Board's motion, and closed the case. The Board now appeals the district court's grant of summary judgment to Cingular and Tower Holdings.

## II.

This case presents a single issue: whether Defendants are entitled to summary judgment on the Board's claim that they breached the revenue sharing provision (section 10(b)) of the lease.[3] The parties do not dispute the facts—only whether those facts constitute a breach of the lease. And contract interpretation is a question of law. *Heritage Court, L.L.C. v. Merritt*, 931 N.E.2d 194, 198 (Ohio Ct. App. 2010) ("Interpretation of written contracts, including lease agreements, involves a question of law.").

We review a district court's grant of summary judgment de novo. *Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020). And because this is a diversity case, "we apply the substantive law of the state in which the district court sits according to the decisions of the state's highest court." *Perry v. Allstate Indem. Co.*, 953 F.3d 417, 421 (6th Cir. 2020). So Ohio's law of contract interpretation governs.[4] And while only the State's highest court is binding,

---

[2] The Board's original complaint included five claims. But its First Amended Complaint included only these two.

[3] In a footnote, the Board also cursorily raises a breach of contract claim regarding sharing of revenue generated from Verizon's collocation agreement. But the Board fails to put forth developed argument, so it forfeited this claim. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

[4] Under Ohio law, forum selection "clauses are prima facie valid in the commercial context, so long as the clause has been freely bargained for." *Kennecorp Mortg. Brokers, Inc. v. Country Club Convalescent Hosp., Inc.*, 610 N.E.2d 987, 989 (Ohio 1993) (emphasis omitted). The lease

where that Court hasn't addressed an issue, lower court opinions help inform us about how the highest court would rule. *Faber v. Ciox Health, LLC*, 944 F.3d 593, 601 (6th Cir. 2019).

The lease requires revenue sharing in three scenarios: (1) when the "Lessee [] sublease[s] space on the Premises, including the [cell tower]," (2) when the Lessee "allow[s] another party's use of the Premises, including the [cell tower]," or (3) when the Lessee permits an entity to collocate on the Premises. (R. 95-1, Lease Agreement § 10(b) at PageID # 4415.) The Management Agreement falls under none of these, so Defendants' failure to share the revenue they received for transferring rights and obligations under that agreement was not a breach.

## A.

The Management Agreement doesn't qualify as a sublease because it doesn't transfer a right to exclusive possession of any part of the Premises. Under Ohio law, courts must consider the entire contents of the instrument to determine whether the parties intended for the agreement to be a lease. *Di Renzo v. Cavalier*, 135 N.E.2d 394, 395 (Ohio 1956). And "[t]he critical and [] only indispensable elements of a lease of an interest in real property are the rights to exclusive possession of a certain quantity of land for a term certain." *Cuvier Press Club v. Fourth & Race St. Assocs., Ltd.*, 439 N.E.2d 443, 447 (Ohio Ct. App. 1981) (emphasis omitted). The Management Agreement and Master Agreement lack these indispensable terms, so the parties could not have intended to create a sublease. In fact, they show the parties intended to *avoid* one.

The Management Agreement says: "[n]otwithstanding anything to the contrary in this Agreement or in the Collateral Agreements, no fee title, leasehold, subleasehold[,] or other real

---

here specifies that it should "be governed, interpreted, construed[,] and regulated by the laws of the State of Ohio." (R. 95-1, Lease Agreement § 27(a) at PageID # 4422.) So Ohio law controls.

property interest in a Managed Site is granted pursuant to this Agreement[.]" (R. 93-16, Management Agreement § 1 at PageID # 3732.) The Master Agreement goes even further.

> [N]either this Agreement nor any Collateral Agreement shall constitute an assignment, sublease, transfer[,] or other conveyance of any claim, contract, license, lease, sublease[,] or commitment if an attempted assignment, sublease, transfer[,] or other conveyance thereof, without the Authorization of a third-party thereto, would constitute a breach or violation thereof or in any way adversely affect the rights of [the parties.]

(R. 103, Master Agreement § 1.3(a) at PageID # 7320.) And if such an unauthorized transaction occurs, the parties agreed to "implement alternative arrangements" to remedy the transaction's adverse effects. (*Id.* § 1.3(b) at PageID # 7320.) In other words, not only does the Management Agreement make clear that Tower Holdings was not transferring an exclusive right to possess real property to CCATT—because doing so would adversely affect the revenue Tower Holdings received—it also provides that the parties intended for a different agreement altogether to govern their relationship if the Management Agreement was a sublease.

The Board cannot rebut this. The best they can do is show that the Management Agreement permitted CCATT to have a physical presence on the Premises. But the right to access property is insufficient to create a lease. One of the primary cases the Board cites highlights why. Although "[a] license to do an act upon land involves the exclusive occupation of the land by the licensee so far as is necessary to do the act and no further, [] a lease gives the right of possession of the land and the exclusive occupation of it for all purposes not prohibited by its terms." *Di Renzo*, 135 N.E.2d at 394. The Management Agreement falls in the first category. It grants CCATT the right to a physical presence on the Premises. But it grants this access only for CCATT to "perform[] its duties . . . [to] manage, administer[,] and operate" the Premises. (R. 93-16, Management Agreement § 1 at PageID # 3732.) Considering the entire instrument, the Management Agreement

doesn't grant CCATT an exclusive possessory interest in the Premises. At most it grants CCATT a license.

True, the Board cites some things that support its view that the Management Agreement is a sublease. For example, it notes that the Management Agreement instructs "that for U.S. federal income Tax purposes this Agreement shall be treated as a lease of the Included Property[.]" (R. 93-16, Management Agreement § 1 at PageID # 3732.) In both SEC filings and press releases, AT&T referred to its agreement with Crown Castle as a lease. And rather than paying CCATT to manage its cell tower, as is typical for a management agreement, CCATT paid Tower Holdings for, as the Board puts it, "the privilege to do the work." (Appellant's Br. at 13–14.) But none of these things satisfy the indispensable requirements for creating a lease under Ohio law—transfer of a property interest in the Premises and the right to exclusive possession of at least part of the Premises for a certain term. *See Cuvier Press Club*, 439 N.E.2d at 447. So the Management Agreement didn't constitute a sublease that triggered section 10(b)'s revenue sharing provision.[5]

B.

The Management Agreement doesn't permit CCATT to "use" the Premises either. While the lease requires Cingular to share revenue it derives from permitting a third party to "use" the

---

[5] At oral argument, the Board suggested that Crown Castle's payment contained prepayment for the lease revenue that Crown Castle would be able to obtain from future collocation on the open tower spots. Normally we don't consider arguments raised for the first time at oral argument. *Reithmiller v. Blue Cross & Blue Shield of Mich.*, 824 F.2d 510, 511 n.2 (6th Cir. 1987). But putting aside the Board's failure to present this argument in its briefing, the argument falls flat. It may well be that Crown Castle paid, at least in part, for the opportunity to find other collocators and to keep that revenue. But that doesn't change our holding that CCATT was not itself a sublessee—the Board doesn't point to any evidence showing that in exchange for this payment AT&T transferred a right to exclusive possession of the unoccupied tower space to CCATT. Moreover, if CCATT can find someone to collocate on the available spots, the Board will be entitled to its share of that rent. (Appellee's Br. at 31–32 (noting that Crown Castle received only the rights to AT&T's share of future collocation revenue, not the Board's.))

Premises, it doesn't define "use." The Management Agreement says that "[t]he rights granted to [CCATT] under this Agreement include, with respect to [the Premises], the right of [CCATT] *to use* and employ the Tower Related Assets[.]" (R. 93-16, Management Agreement § 1 at PageID # 3732 (emphasis added).) So the alleged breach depends on whether that right to "use" the cell tower and its related assets is the same right the lease contemplates when it says that the Lessee must share revenues with the Board generated from "allow[ing] another party's use of the Premises, including the [cell tower.]" (R. 95-1, Lease Agreement § 10(b) at PageID # 4415.) The Board argues that because "use" is not defined in the lease we must give the word its ordinary meaning: "the legal enjoyment of property that consists in its employment, occupation, exercise or practice." (Appellant's Br. at 28–30 (quoting *Use*, Merriam Webster's Collegiate Dictionary (10th ed. 1996).) Defendants restate the district court's position: "use" means the activities section 3 of the lease permits Cingular to conduct on the Premises, actions the Management Agreement does not permit CCATT to take. Defendants have the stronger argument.

"[C]ommon words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978). The plain and ordinary meaning of "use" encompasses CCATT's contract rights here. To use something means "[t]o employ for the accomplishment of a purpose; to avail oneself of." *Use*, Black's Law Dictionary (11th ed. 2019). The Management Agreement permits CCATT to "use and employ the Tower Related Assets" to "manage, administer[,] and operate" the Premises. (R. 93-16, Management Agreement § 1 at PageID # 3732.) In other words, the Agreement permits CCATT to employ the Premise for the accomplishment of its managerial purposes. Thus, the Board's interpretation prevails unless it's

manifestly absurd or the parties clearly intended "use" to have another meaning. And it's clear that the parties did so intend.

Section 3 of the lease explains that the "Lessee's Use of the Premises" will be "for (i) the installation, operation, maintenance, repair, replacement[,] and relocation of all of the Equipment comprising the Cell Site and (ii) for the transmission and reception of communication signals pursuant to all rules and regulations of the [FCC]." (R. 95-1, Lease Agreement § 3 at PageID # 4412.) Courts presume that parties intend for the same word to have the same meaning throughout a contract. *Sherock v. Ohio Mun. League Joint Self-Ins. Pool*, No. 2003-T-0022, 2004 WL 605105 at *4 (Ohio Ct. App. Mar. 29, 2004) ("Where a contract gives precise meaning to a particular term, the term should be construed consistently as having that meaning throughout the contract, absent some evidence of intent to the contrary."); *cf. Rhodes v. Weldy*, 20 N.E. 461, 465–66 (Ohio 1889) ("Where the meaning of a word or phrase in a statute is doubtful, but the meaning of the same word or phrase is clear where it is used elsewhere in the same act, or an act to which the provision containing the doubtful word or phrase has reference, the word or phrase in the obscure clause will be held to mean the same thing as in the instances where the meaning is clear." (quoting *Raymond v. City of Cleveland*, 42 Ohio St. 522, 529 (1885))). Because the lease gives clear meaning to the phrase "Lessee's Use of the Premises" in section 3, that definition also applies to the phrase "another party's use of the Premises" in section 10(b). Thus, the Management Agreement only triggered section 10(b)'s revenue-sharing provision if it granted CCATT the rights to carry out the functions listed in section 3.

The Agreement doesn't do so. It grants CCATT the right "to use and employ the Tower Related Assets" to "perform[] its duties" to "manage, administer[,] and operate" the Premises. (R. 93-16, Management Agreement § 1 at PageID # 3732.) But nothing in the Management Agreement

10

purports to permit CCATT to install, operate, maintain, repair, replace, or relocate *cell tower equipment*, nor does it permit CCATT to transmit or receive communication signals. Those rights remained with AT&T and the other collocators. And nothing else in the record or the Board's briefing shows that CCATT can do those things. Thus, the Management Agreement didn't trigger section 10(b)'s revenue-sharing provision by allowing another party's use of the Premises.

C.

The parties agree that "collocation," as used in the lease, incorporates the definition of that term in the North Canton Zoning Ordinance. (Appellant's Br. at 27; Appellees' Br. at 24.) The Ordinance defines collocation as: "[t]he use of a wireless telecommunications facility by more than one wireless telecommunications provider." (R. 93-4, N. Canton Zoning Ordinance § 1157.02(a) at PageID # 3170.) The Board does not argue—nor is there any record evidence to support—that CCATT qualifies as a wireless telecommunications provider, under any definition of that term. Because it's undisputed that CCATT is not a wireless telecommunications provider, the Management Agreement couldn't permit CCATT to collocate on the premises and didn't trigger section 10(b)'s revenue sharing provision.

III.

The Management Agreement isn't a sublease. And it doesn't permit CCATT to "use" the Premises, within the meaning of that term in the lease, nor does it permit CCATT to "collocate" on the Premises. Thus, the Management Agreement didn't trigger any of the lease's revenue sharing provisions. Because the lease didn't require Cingular or Tower Holdings to share any of the revenue they, or their parent company, received through the Management Agreement, Cingular didn't breach the lease when it failed to do so. Without a breach, the district court correctly granted summary judgment to Defendants. So we **AFFIRM**.